**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE SELLERS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10 C 7951 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff, Wayne Sellers ("Sellers"), seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying his application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act ("Act").[2] Sellers has filed a Motion for Summary Judgment seeking a judgment reversing or remanding the Commissioner's final decision. The Commissioner has filed a Motion for Summary Judgment to affirm the Commissioner's decision. For the reasons set forth below, Sellers' motion is granted [dkt. 28] and the Commissioner's motion is denied [dkt. 30].

**I.      Procedural History**

On March 21, 2009, Sellers filed an application for DIB, alleging a disability onset date of

---

[1] On April 8, 2011, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (dkts. 11, 13).
[2] *See* 42 U.S.C. §§ 416(i), 423.

January 1, 1996.[3] The SSA denied his application initially, and again upon reconsideration.[4] Thereafter, Sellers filed a timely written request for a hearing, which was granted.[5] On November 23, 2009, a hearing was conducted before Administrative Law Judge ("ALJ") Sherry Thompson in Oak Brook, Illinois.[6] During the hearing, the ALJ heard testimony from Sellers, as well as vocational expert ("VE") Richard Fisher.[7]

On December 21, 2009, the ALJ issued an unfavorable decision finding that Sellers was not disabled under the Act.[8] Thereafter, Sellers appealed the ALJ's determination to the Appeals Council of the SSA. After considering new evidence submitted by Sellers,[9] the Appeals Council denied Sellers' request on November 5, 2010, making the ALJ's ruling the final decision of the Commissioner.[10] Sellers timely filed the instant action on December 15, 2010.[11]

## II.    Statement of Facts

We now summarize the administrative record. We set forth the general background evidence concerning Sellers' history and medical complaints, followed by the objective medical evidence considered by the ALJ. We then discuss the hearing testimony, before addressing the ALJ's written opinion.

---

[3]  R. at 18.
[4]  *Id.*
[5]  *Id* .
[6]  R. at 36.
[7]  R. 35-58.
[8]  R. at 1-3.
[9]  R. at 5.
[10]  R. at 1; 20 C.F.R. § 404.981; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).
[11]  Pl.'s Compl. (dkt. 6).

## A.     Introduction and Medical Evidence

Sellers was forty-five years old at the time of the administrative hearing.[12] He attended high school until the tenth grade.[13] Sellers testified that he is illiterate, can only perform basic math, was frequently absent from school, and was enrolled in classes for "slow kids" during high school.[14] Sellers does not have a driver's license and cannot remember the last time that he worked.[15] Sellers claims that he is unable to work due to a psychotic disorder,[16] hypertension,[17] chronic kidney disease,[18] and frequent headaches.[19] At the time of the hearing, Sellers was living alone in low income housing.[20]

We begin our review of Sellers' medical history on June 28, 2004, the date of his admission to the Silver Cross Hospital emergency room ("ER") for uncontrolled hypertension, headaches, acute renal failure, and elevated blood pressure.[21] During his stay, Sellers' blood pressure was measured at 230/150, and his doctors noted that he was at high risk for coagulation.[22] Sellers was also diagnosed with an inguinal hernia, which was successfully removed.[23] Naila Ahmed, M.D., also diagnosed Sellers with "acute-on-chronic renal failure" and noted renal insufficiency.[24] In addition,

---

[12] R. at 39.
[13] R. at 40.
[14] *Id.*
[15] R. at 40-41.
[16] R. at 462, 482.
[17] R. at 42, 247-49, 251, 309, 331-32, 420.
[18] R. at 247-49, 258, 266, 271, 308-10, 324, 345-6, 356, 420.
[19] R. at 42-44, 247-49, 332, 532.
[20] R. at 39-40, 48-49.
[21] R at 247-309.
[22] R. at 251. For reference, coagulation is defined as the "sequential process by which the multiple coagulation factors of the blood interact in the coagulation cascade, ultimately resulting in the formation of an insoluble fibin clot." Dorland's Illustrated Medical Encylcopedia, 30th ed., Elsevier Publishing, at 380.
[23] R. at 21-22.
[24] R. at 309-10.

an MRI of Sellers' brain revealed cerebral edema.[25] He was discharged on July 6, 2004 in stable condition.[26] On February 23, 2006, State agency physician Richard Bilinsky, M.D., found Sellers' high blood pressure and renal failure were resolved or controlled, and were not severe impairments.[27] State agency physician Francis Vincent, M.D., found the same on July 11, 2007.[28]

Sellers' creatinine levels were recorded as elevated on several occasions following his hospitalization.[29] As late as April 2006, Sellers' treating physician, Morufu Olantunji Alausa, M.D., diagnosed him with stage three chronic kidney disease,[30] and has consistently prescribed Sellers the medications Clonodine, Lasix, Lisinopril, Procardia, and Labetalol.[31] Sellers reported that these medications made him feel drowsy,[32] dizzy,[33] and fatigued,[34] causing him to rest for most of the day.[35] A secondary treating physician and colleage of Dr. Alausa, most likely Dr. Sifuentes, completed a Physical Impairment Residual Functional Capacity Questionnaire indicating that Sellers' physical capacity was limited to standing, sitting and carrying for no more than twenty minutes at a time; that Sellers should not carry any weight; and that Sellers frequently experiences pain or discomfort severe enough to interfere with his concentration.[36]

On an activities of daily living questionnaire, Sellers reported that he did no cooking or cleaning and relied heavily on family members for his basic needs, and stated that he could not take

---

[25] R. at 251.
[26] R. at 274.
[27] R. at 337-38.
[28] R. at 356.
[29] R at 336, 350, 396, 402, 404, 407.
[30] R 333, 345-46, 520, 536.
[31] R at 39, 207, 217, 314, 316, 328, 356, 431.
[32] R at 32, 48, 178, 180, 301-04, 480-82.
[33] R. at 178, 181.
[34] R. at 177, 301-04.
[35] R. at 178.
[36] R. at 438-441.

public transit without assistance.[37] He further stated that he has difficulty concentrating and is afraid of other people because they are "out there to rob him and hurt him."[38] Sellers also reported that he became angry easily and threatened to slap others, and frequently got upset when ordered to do something or when receiving criticism.[39]

On August 6, 2007, John Brauer, Psy. D., a clinical psychologist, performed a consultative examination of Sellers.[40] He noted Sellers' history of visual and auditory hallucinations and "long standing pattern" of conversations with an imaginary person named "Booze," who told him "to quit taking all this medicine or to take it all."[41] Dr. Brauer opined that Sellers' concentration and attention span were limited based on his performance on digit span, serial sevens, and simple arithmetic problems.[42] He opined that Sellers' general fund of knowledge "appears to be poor" based on his inability to name recent U.S. Presidents, five large cities, and five currently living famous people.[43] In addition, Dr. Brauer opined that Sellers' capacity for abstraction and judgment were poor, and he would be unable to manage his finances.[44] Dr. Brauer observed that Sellers' "degree of effort was quite poor for all aspects of the evaluation, but [also] consistent with his description of himself [as] quite impaired by drowsiness from medications."[45] He diagnosed Sellers with psychotic disorder.[46]

On August 17, 2007, Jerrold Heinrich, Ph.D., a non-examining State agency psychologist, opined that Sellers could understand, remember, and execute short and simple instructions, could

---

[37] R. at 180.
[38] R. at 182.
[39] R. at 182-183.
[40] R. at 480.
[41] R. at 480-481.
[42] R. at 481.
[43] *Id.*
[44] R. at 482.
[45] *Id.*
[46] *Id.*

concentrate and persist adequately on task within an organized and low-stress setting, and would be unable to interact frequently with others.[47] Dr. Heinrich further found that Sellers would be moderately limited in his ability to adjust to changes in his environment and would need guidance to make and complete realistic plans, but would not be limited in his ability to perceive normal hazards or to use public transportation and travel in unfamiliar places.[48] Dr. Heinrich stated that Sellers performed poorly in formal mental status testing, and relies upon family members to assist him with essential activities, but found Sellers' basic grooming and activities of daily living ("ADLs") remained intact.[49]

On August 20, 2009, State agency psychologist David Biscardi examined Sellers.[50] Dr. Biscardi found that Sellers suffered from a severe mental impairment, but further examination was necessary to diagnose him.[51] Dr. Biscardi also noted that Sellers fell asleep several times during the examination, and that Sellers reported that his family helped him with essential activities.[52]

## B.    The November 23, 2009 Hearing

Sellers' hearing before the ALJ occurred on November 23, 2009, in Oak Brook, Illinois. Sellers appeared in person and was represented by attorney Jody Broval. The ALJ heard testimony from Sellers, as well as vocational expert ("VE"), Richard Fisher.

At the hearing, Sellers testified that he suffers from uncontrolled high blood pressure and

---

[47] R. at 475.
[48] *Id.*
[49] R. at 476.
[50] R. at 523.
[51] *Id.*
[52] *Id.*

headaches, as well as pain in his arms, legs, chest, and back.[53] Sellers reported that he takes blood pressure medication two to three times daily, which causes him to feel drowsy.[54] Sellers further testified that he is borderline diabetic and that his high blood pressure causes kidney problems.[55]

Sellers testified that he spends most of his time sleeping or watching television, and relies on his two nephews to cook and clean for him, pay his bills, and drive him to doctors' visits.[56] Sellers also testified that he has difficulty remembering things and does not get along well with others or trust them.[57] Sellers described visual and auditory hallucinations of his deceased brother and father, who were "always telling [Sellers] to go with them . . . all the time."[58] Sellers also testified that he walks with a cane that he found, and he can stand for only a few minutes because his "head [is] always swimming."[59]

The VE testified next. The VE referenced the Dictionary of Occupational Titles ("DOT") to classify Sellers' past relevant work as a driver as typically semi-skilled, medium work, but stated the work may also be performed by someone limited to light work.[60]

The ALJ then sought the VE's opinion on a hypothetical individual. In this hypothetical, the ALJ described an individual with the same age, education, and work experience of Sellers and a residual functional capacity to perform a full range of work at every exertional level, who can: understand, remember and execute short and simple instructions; concentrate and persist adequately

---

[53] R. at 42, 43-45.
[54] R. at 43.
[55] R. at 45-46
[56] R. at 48-50, *see* R. 180.
[57] R. at 49-50.
[58] R. at 47.
[59] R. at 51.
[60] R. at 54.

on task within an organized setting which allows him to work at his own pace; have occasional interaction with others; adjust to routine changes in the environment as long as they are not too frequent; and make and perform realistic plans only with guidance.[61]

The VE stated that the following unskilled, medium work occupations in Illinois could be performed by such an individual: dining room attendant (DOT 311.677.018) and counter supply worker (DOT 319.687-010 ), with a combined total of 12,282 jobs; and kitchen helper (DOT 318.687-010), with 15,950 jobs.[62] The VE also testified that the following Illinois jobs in the light work category could be performed by the hypothetical individual: laundry worker / domestic (DOT 302.685-0101), ironer (DOT 302.687-101), and cleaner / housekeeping (DOT 323.687-014), a combined total of 12,702 jobs.[63] The VE also testified that the following Illinois sedentary jobs would exist for a claimant with the same non-exertional limitations described above: cutter and paster of press clippings (DOT 249.587-014) and document / microfilm preparer (249.587-018), with 4,971 total jobs; and hand bander (920.687-030) and ampoule sealer (559.687-014), for 1,827 total jobs.[64] The jobs listed by the VE had a specific vocational preparation time ("SVP") of two.[65]

The ALJ then altered the hypothetical to include an individual who was limited to sitting, standing, and walking less than two hours with no lifting, in addition to the non-exertional mental limitations.[66] The VE replied that there would be no jobs for such an individual. The VE added there

---

[61] *Id.*
[62] R. at 55.
[63] *Id.*
[64] R. at 55-56.
[65] R. at 55. An SVP of two means that to learn a new job, the worker will need training that involves "anything beyond short demonstration up to and including 1 month." *Appendix C: Components of Definition Trailer,*United States Department of Labor Office of Administrative Law Judges Library, http://www.oalj.dol.gov/public/dot/references/dotappc.htm.
[66] R. at 56.

8

would be no jobs at the unskilled level for an individual who would be off task twenty percent of the time.[67] The ALJ then inquired regarding use of a cane, to which the VE responded that cane use would eliminate all of the proffered medium and light work jobs.[68]

### III. The ALJ's Decision

In her December 21, 2009 opinion, the ALJ applied the Act's sequential five-step analysis and found that Sellers was not disabled within the meaning of the Act and, therefore, was not entitled to DIB or a period of disability.[69] To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[70] Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy.[71]

The Social Security regulations provide the five-step sequential evaluation process for the ALJ's determination of whether a claimant is disabled.[72] The ALJ must determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5)

---

[67] *Id.*
[68] R. at 57.
[69] R. at 15-28.
[70] 42 U.S.C. § 423(d)(1)(A).
[71] 42 U.S.C. § 423(d)(2)(A).
[72] 20 C.F.R. § 404.1520(a)(4).

whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[73] A finding of disability requires an affirmative answer at either step three or step five, while a negative finding at any step other than step three precludes a finding of disability.[74]

As an initial matter, the ALJ determined that Sellers met the insured status requirements of the Act through September 30, 2000.[75] At step one, the ALJ found that Sellers had not engaged in any substantial gainful activity since January 1, 1996, the alleged disability onset date.[76] At step two, the ALJ found that Sellers suffered from the severe impairments of psychotic disorder and hypertension.[77] The ALJ concluded that Sellers' hernia and kidney disease were not severe because Sellers' hernia operation was successful and he was receiving no current treatment for his kidney condition, which appeared to have stabilized.[78] In so concluding, the ALJ adopted the State agency's finding that Sellers' "renal failure problem was resolved and was, therefore, nonsevere."[79]

The ALJ then concluded at step three that Sellers lacked any impairment or combination of impairments meeting or medically equaling those listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[80] The ALJ observed that the paragraph B criteria of Listing 12.03 (Schizophrenic, Paranoid, and Other Psychotic Disorders) could only be satisfied if Sellers' mental impairment resulted in at least two of the following four limitations: "(1) marked restriction in the activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining

---

[73] *Id.*
[74] *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).
[75] R. at 20.
[76] *Id.*
[77] *Id.*
[78] R. at 20-21.
[79] R. at 21.
[80] *Id.*

concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."[81]

The ALJ adopted the State agency's determination wholesale, finding that Sellers had only moderate restriction in his activities of daily living and social functioning, as well as only moderate difficulties with concentration, persistence, and pace, and no documented episodes of decompensation of extended duration.[82] The ALJ noted that "[a]lthough the claimant did present at the emergency room on two separate occasions, these admissions were related to his hypertension and not his mental impairment."[83] Because the ALJ found no marked limitations, she concluded that the paragraph B criteria were not satisfied.[84]

The ALJ also determined that the paragraph C criteria were not met. She concluded that "there is no documentation" showing Sellers had a mental disorder for at least two years' duration, or that caused more than minimal limitation in his "ability to do basic work activities."[85] The ALJ noted that this finding "is consistent with the State's agency's determination," which she adopted.[86]

Next, the ALJ assessed Sellers' residual functional capacity ("RFC.")[87] The ALJ assigned great weight and adopted the opinions of several State agency examining experts,[88] including: Richard Bilinsky, M.D., who found on February 23, 2006, that Sellers' high blood pressure and acute renal failure were controlled or resolved and therefore were not a severe impairment;[89] Frances

---

[81] *Id.*
[82] *Id.*
[83] R. at 22.
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] R. at 22-23.
[88] R. at 22.
[89] R. at 337-38.

Vincent, M.D., who similarly found on July 11, 2007 that Sellers' renal failure in 2004 had been resolved and that his hypertension is controlled by medication;[90] John Brauer, Psy.D., who evaluated Sellers on August 6, 2007, diagnosing psychotic disorder based on hallucinations;[91] and Jerrold Heinrich, Ph.D., who completed a Psychiatric Review[92] and a Mental Residual Functional Capacity Assessment on August 17, 2007,[93] finding that although Sellers suffered from several moderate impairments, none were severe.[94]

Based on these opinions, the ALJ concluded that Sellers could perform a full range of work at all exertional levels, but with the following non-exertional limitations: ability to understand, remember, and execute only short and simple instructions; ability to concentrate and persist adequately on tasks only within an organized setting that allows him to work at his own pace; ability to interact with co-workers and supervisors only occasionally; ability to adjust to routine changes in his environment so long as they are not too frequent; and ability to make and complete realistic plans only with guidance.[95] In reaching these conclusions, the ALJ noted that she had considered all of Sellers' symptoms and the extent to which they were consistent with the objective medical evidence,[96] as well as all opinion evidence.[97]

The ALJ then moved to the two-step credibility determination regarding Sellers' opinion testimony. The ALJ first determined that Sellers' testimony was supported by underlying medically

---

[90] R. at 356.
[91] R. at 480-82.
[92] R. at 460-73.
[93] R. at 474-77.
[94] R. at 475-76.
[95] R. at 22.
[96] R. at 23; *see* 20 C.F.R. 404.1529 and SSRs 96–4p and 96–7p.
[97] *Id.*; *see* 20 C.F.R. 404.1527 and SSRs 96–2p, 96–5p, 96–6p and 06–3p.

determinable physical or mental impairments that could reasonably be expected to produce his claimed symptoms.[98] However, at the second step of her determination, the ALJ found that Sellers' testimony concerning the intensity, persistence and limiting effects of his symptoms, in light of all the evidence in the record, was not credible.[99]

The ALJ evaluated Sellers' testimony regarding each impairment Sellers identified as a basis for disability, beginning with his high blood pressure.[100] The ALJ found Sellers' allegations that he lacked medical insurance and could not afford medicine were not credible explanations for his failure to take his hypertension medication prior to his hospitalization for severe high blood pressure in 2004.[101] The ALJ also found that Sellers' hypertension since the hospitalization appears controlled, despite some fluctuations, and is not currently a limitation on his abilities.[102]

The ALJ made a similar finding regarding Sellers' claim of psychosis, noting that no documentation of his tendency to hallucinate appeared in the record besides the notes from the State agency's examining psychologist.[103] The ALJ stated that Sellers' lack of medication or treatment for this condition was "alarming," and that she "would expect to see regular treatment and a regular medication regime" for a condition alleged to be so severe. Because the ALJ found no record that Sellers reported his mental condition to his physicians, nor any record of medical treatment for his mental condition, the ALJ found that Sellers' alleged mental symptoms are manageable and not as severe as alleged.[104]

---

[98] R. at 23.
[99] *Id.*
[100] R. at 23.
[101] R. at 24.
[102] *Id.*
[103] *Id.*
[104] R. at 25.

The ALJ also found that the absence from the medical reports of any complaints about Sellers' medication inducing a "zombie like state" undermined Sellers' credibility in his complaint that he is drowsy most of the day.[105] However, the ALJ stated that she took Sellers' alleged drowsiness into account in the RFC she applied to his case.[106]

The ALJ next made the finding that Sellers' claim that his ADLs were extremely limited was not fully credible.[107] She found Sellers' claims of forgetfulness, inability to cook meals or do housework, difficulty concentrating, and inability to leave his house alone were not borne out by the evidence.[108] This credibility finding included Sellers' claim that he leaves his home only three or four times per month for medical and family visits, which the ALJ found to be specifically contradicted by evidence that Sellers "appeared at the Will County Community Health Center with some regularity."[109]

Finding Sellers not credible regarding the intensity and limiting effects of any of his claimed impairments, the ALJ did not revisit her RFC determination based on his testimony.

## IV.    Standard of Review

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[110] The District Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal

---

[105]  R. at 24.
[106]  *Id.*
[107]  R. at 25.
[108]  *Id.*
[109]  *Id.*
[110]  *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

error.[111] Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate findings as to disability.[112] However, the ALJ must build an accurate and logical connection from the evidence to her ultimate conclusion.[113] While the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate her reasons for crediting or discrediting evidence of disability.[114]

## V.    Analysis

Sellers argues that the Court should reverse or remand the ALJ's decision because the ALJ committed legal error in: (1) improperly assessing Sellers' credibility; and (2) failing to address evidence of Sellers' exertional limitations. We address each argument in turn.

## A.    The ALJ's Credibility Determination

Sellers asserts the ALJ erred in according little weight to his testimony concerning his functional limitations, psychotic symptoms, and activities of daily living ("ADLs").[115] Sellers contends that the ALJ dismissed his testimony simply because it did not mesh with her views, and supported her findings with meaningless boilerplate language.[116] Sellers argues that the ALJ impermissibly concluded that his proffered lack of medical insurance and inability to afford medication could not explain his failure to obtain psychological treatment.[117] Finally, Sellers asserts that the ALJ failed to draw a logical connection between recurrent evidence of Sellers' extreme

---

[111] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[112] *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).
[113] *Dixon v. Massanori*, 270 F.3d 1171, 1176 (7th Cir. 2001).
[114] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).
[115] Dkt. 29 at 13.
[116] *Id.* at 14-15.
[117] *Id.*

drowsiness and the credibility of his statements regarding drowsiness.[118]

The Commissioner responds that the ALJ's use of "boilerplate" language was not impermissible because the language was meaningful when taken together with the ALJ's discussion of other evidence.[119] The Commissioner contends that the ALJ properly assessed Sellers' credibility regarding his lack of mental health treatment because Sellers had "full access to medical care" during his routine visits to Will County Community Health Center, and had shown himself capable of seeking and obtaining treatment for other physical ailments there.[120] The Commissioner asserts that the ALJ also properly assessed Sellers' credibility concerning his drowsiness based on her "rational explanation" that the lack of more consistent medical reports of drowsiness led to the reasonable conclusion that Sellers was not as drowsy as he claimed.[121] Similarly, the Commissioner argues that by relying on Dr. Heinrich's opinion that Sellers was not disabled, the ALJ properly explained why Sellers' drowsiness was not more concretely accounted for in the RFC.[122]

We begin by noting that "[a]n ALJ's credibility determinations deserve special deference, because only the ALJ observes the Claimant testify."[123] However, an ALJ still "must confront the evidence that does not support [her] conclusion and explain why it was rejected," including testimonial evidence from the claimant.[124] Although we review credibility determinations deferentially, where "the determination rests on 'objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater

---

[118] *Id.* at 15.
[119] Dkt. 31 at 10.
[120] *Id.* at 11-12.
[121] *Id.* at 13.
[122] *Id.*
[123] *Griffo v. Astrue*, 767 F.Supp.2d 912, 922 (N.D. Ill. 2011).
[124] *Indoranto*, 374 F.3d at 474 (citing *Kasarsky*, 335 F.3d at 543, *Brindisi*, 315 F.3d at 786).

freedom to review the ALJ's decision.'"[125]

The ALJ discredited Sellers' claims of extreme drowsiness,[126] finding no evidence of Sellers' alleged drowsiness – other than his own testimony – and observing no complaints of drowsiness by Sellers to his doctors or evidence that his medications were switched to alleviate his drowsiness.[127] However, as Sellers correctly notes, SSR 96-7p prohibits an ALJ from "draw[ing] any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ."[128] As the Seventh Circuit has held, "some patients may not complain because the benefits of a particular drug outweigh its side effects."[129] Further, no alternative medications without such side effects may currently exist.

Sellers testified that he had not received treatment for his symptoms because he has no health insurance.[130] The ALJ neither provided a subjective basis for rejecting Sellers' testimony nor used other evidence to contradict Sellers' claims of extreme drowsiness. Though not acknowledged by the ALJ, Sellers' claims regarding his drowsiness were in fact supported by medical reports from three separate evaluative interviews by the State, all of which the ALJ adopted in her analysis of the severity of Sellers' limitations.[131] For example, on August 17, 2007, Dr. Heinrich stated, "[Sellers] was sleepy and had to be awakened several times in the course of the interview."[132] Similarly, on

---

[125] *Id.* (citing *Clifford*, 227 F.3d at 872).
[126] Dkt. 29 at 15. Sellers described himself as feeling "like a zombie," "in a trance," "fatigued" and "dizzy." At hearing Sellers stated that after a few minutes of standing, "I get real tired and stuff. Head always swimming. Head pain and my head always swimming." R. at 51.
[127] R. at 24.
[128] *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).
[129] *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).
[130] R. at 44-45.
[131] R. at 22 (assigning weight).
[132] R. at 472.

August 6, 2007, Dr. Brauer stated, "[Sellers] was sleepy, and had to be awakened several times in the course of the interview (he states that he is always like this, due to the medications)."[133] Likewise, on April 20, 2009, Dr. Biscardi stated, "[Sellers] was sleepy and had to be awakened several times during the evaluation (reportedly meds SEs[134])."[135]

The ALJ's only basis for rejecting Sellers' claim of drowsiness is the absence of documentation showing that Sellers complained of drowsiness to a treating physician. We find that ALJ's rejection of Sellers' credibility on this point was not properly supported, especially in light of the recorded observations of Sellers' drowsiness by several medical providers. In this instance, the ALJ has failed to draw an accurate and logical bridge between the evidence and her conclusions.

We also find that, although the ALJ stated that she factored Sellers' drowsiness into her RFC determination, how this was accomplished remains unclear.[136] Sellers testified that he typically spends his time sleeping[137] because he is unable to concentrate or stay awake.[138] Dr. Brauer's report confirms that Sellers' concentration and attention span are limited, as evidenced by Sellers' poor responses during basic testing.[139] The ALJ's opinion is devoid of any explanation as to how she harmonized any consideration of Sellers' extreme and perpetual drowsiness with her RFC determination that Sellers is able to work at all exertional levels.[140]

The ALJ also fails to support her finding that Sellers is not significantly limited in his

---

[133] R. at 482.
[134] This is shorthand for "side effects."
[135] R. at 523.
[136] R. at 24. After finding that Sellers' claims of extreme drowsiness not credible, the ALJ stated that she included this alleged medication side effect into the RFC anyway.
[137] R. at 48-50.
[138] R. at 182.
[139] R. at 481; *see supra* at p. 5.
[140] R. at 24.

activities of daily living ("ADLs"), including his ability to manage funds, to travel independently, to respond appropriately to hazards, and to secure his basic needs.[141] The verbal portions of the psychiatric report by Dr. Brauer, which the ALJ adopted, contradicted the ALJ's finding that Sellers is not significantly limited in these abilities. Dr. Brauer stated that Sellers' capacity for abstraction and judgment were poor, "as seen by [Sellers'] responses to commonly used judgment vignettes."[142] In one such scenario, Sellers was asked to react to the statement, "fire in a theatre," and Sellers responded, "drop and roll."[143] Dr. Brauer concluded that "[i]n light of [Sellers'] cognitive deficits and his lack of understanding of financial matters, he is not able to manage funds on his own behalf."[144] Written statements from Doctors Brauer and Heinrich both support Sellers' claimed limitations on his ADLs, including being dependant on family members in all of his essential activities.[145] However, the ALJ offered no reasoning for her rejection of the evidence that supported Sellers' claims. The only evidence the ALJ used to support her finding that Sellers was not credible regarding his inability to leave home alone, or to leave home more than three or four times per month, was her finding that Sellers "appeared at the Will County Community Health Center ["Center"] with some regularity."[146] However, a review of the dates of Sellers' appointments at the Center shows that he attended appointments only once or twice per month, in keeping with Sellers' testimony.[147] Without further explanation from the ALJ, we find that remand is appropriate.

---

[141] R. at 482.
[142] Id.
[143] Id.
[144] Id.
[145] R. at 476, 523.
[146] R. at 25.
[147] R. at 314-24; 381-406.

## B.    Sellers' Exertional Limitations

We next consider Sellers' arguments concerning his exertional limitations and find some minor errors that alone may not require reversal, but taken together support our decision to remand. Sellers argues the ALJ failed to consider or properly evaluate four types of evidence in her determination of his RFC, including: (1) evidence from State examining physician, Dr. Jerrold Heinrich, that Sellers is limited to a low-stress work environment; (2) evidence that Sellers is illiterate, must work at his own pace and has poor ability to adapt to changes in his work environment; (3) evidence of Sellers' psychotic disorder; and (4) evidence that Sellers continues to be limited by chronic kidney disease ("CKD").

### 1.    Evidence that Sellers is limited to an organized, low-stress environment

Sellers claims the ALJ failed to review Dr. Heinrich's opinion before determining the RFC, and that an analysis of this opinion could have changed the RFC.[148] Sellers contends that Dr. Heinrich found Sellers could "concentrate and persist adequately on tasks within an organized and low-stress setting," but that the ALJ omitted the "low-stress setting" requirement.[149] Sellers further claims the ALJ's instructions to the VE included an erroneous characterization of the opinions of Doctors Heinrich and Biscardi, showing that the ALJ did not carefully consider the evidence.[150]

The Commissioner argues that nothing in the record shows the ALJ analyzed Dr. Heinrich's opinion after – rather than before – she made her RFC determination.[151] The Commissioner alleges Dr. Heinrich did not place any low-stress "requirement" on Sellers' exertional limitations and that

---

[148]    *Id.*
[149]    *Id.* at 8 (citing r. at 21) (emphasis added).
[150]    Dkt. 29 at 9.
[151]    Dkt. 31 at 2; dkt. 35 at 1-2.

20

the limitation of work "within an organized and low-stress setting" did not mean that Sellers would be unable to concentrate in any other environment.[152] The Commissioner further contends that the opinions of Doctors Heinrich and Biscardi were based on years prior to Sellers' disability onset date, from which no medical documentation was available.[153]

Sellers' argument regarding the order in which the ALJ considered the evidence lacks merit. The ALJ stated that she reviewed and gave great weight to Dr. Heinrich's opinion.[154] There is no evidence to support Sellers' claim that she did so only after determining his RFC. To the contrary, the ALJ first adopted Dr. Heinrich's Exhibit 14F during her Listing analysis.[155] We thus find that the ALJ properly considered Dr. Heinrich's opinion, even if she indicated as much by simply adopting Exhibit 14F as "consistent with" the RFC.[156] Moreover, the cases which Sellers cites in support of his position are inapposite because the ALJ in those cases failed to consider certain evidence at all.[157]

Sellers' second argument, however, merits closer examination. The record shows the ALJ did not include in her instructions to the VE[158] the second part of the medically determined limitation that she explicitly adopted in her opinion.[159] Though the Commissioner argues that this limitation was not a "requirement," it is well settled that "the hypothetical question [the ALJ] poses to the VE

---

[152] *Id.*

[153] Dkt. 31 at 3.

[154] R. at 22.

[155] R. at 22.

[156] R. at 25.

[157] Dkt. 35 at 1-2. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (noting failure to include claimant's severe mental impairments in discussion of the RFC); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (noting the failure to acknowledge or discuss "a critical piece of evidence" anywhere in the opinion).

[158] R. at 54.

[159] R. at 22 (adopting and assigning great weight to Dr. Heinrich's opinions at Exhibits 14F and 15F). Dr. Heinrich stated in his Functional Capacity Assessment that Sellers "can concentrate and persist adequately on tasks within an organized and low-stress setting." R. at 476.

must incorporate *all* of the claimant's limitations supported by medical evidence in the record."[160] Although Sellers does not provide any predictions as to how this relatively minor change would be likely to affect the jobs available to him, we cannot say without further opinion from the VE that Sellers would remain eligible for all the proffered jobs notwithstanding this additional limitation.[161]

Sellers also correctly points out that although a portion of Dr. Biscardi's opinion relates to the time period from before Sellers' alleged date of disability onset,[162] the ALJ misconstrued the opinion as a whole because Dr. Biscardi later stated that the evidence as of 2009 was insufficient to diagnose Sellers, leading him to suggest that a detailed Mental Status Exam should be carried out.[163] Thus Dr. Biscardi did not opine that Sellers' "mental impairment is nonsevere."[164] Although this mischaracterization may reveal some carelessness in the ALJ's consideration of this portion of the evidence, the ALJ found in Sellers' favor that his mental impairment was severe, if not significantly limiting, making the ALJ's misrepresentation of Dr. Biscardi's opinion harmless.[165]

## 2. Evidence of functional limitations on Sellers' persistence and pace

Sellers next argues that after the ALJ determined Sellers' limitations, she "failed to translate [them] into meaningful vocational considerations."[166] Sellers contends that the RFC suggests sheltered rather than competitive work because it requires an employer to allow Sellers to work at his own pace, and to provide guidance to Sellers before he can make and complete realistic plans.[167]

---

[160] *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (emphasis added).

[161] *See Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) (finding ALJ's failure to include frequent deficiency of concentration, persistence or pace into instruction to VE was reversible error because in combination with claimant's other limitations, the VE could find no jobs would be available).

[162] R. at 523 ("[a] severe mental dx cannot be established prior to DLI").

[163] *Id.*

[164] R. at 26.

[165] *Id.*

[166] Dkt. 29 at 10.

[167] *Id.*

Sellers argues that his illiteracy further limits his abilities, and that the ALJ failed to consider it despite Sellers' testimony on the issue.[168] Sellers points to Section 200.00(h)(1), which provides that a finding of disability is warranted where an individual aged 45-49 is (1) restricted to sedentary work, (2) is unskilled or has no transferable skills, (3) can no longer perform past relevant work, and (4) is unable to read or write in English.[169] Sellers notes that the last three elements are clearly satisfied, though his illiteracy was never acknowledged by the ALJ.[170] If the ALJ were to conclude that Sellers is limited to sedentary work, a finding of disability would be directed.

The Commissioner replies that the VE identified 52,000 jobs that matched the RFC determined by the ALJ, [171] and rejects Sellers' illiteracy argument as irrelevant.[172]

Sellers' argument is persuasive. Once a claimant has raised the issue of his potential illiteracy, the ALJ has an obligation to develop a complete record.[173] Although, as the Commissioner notes, Sellers has no vocational expertise to evaluate the type of workplace his RFC qualifies him for,[174] the ALJ's failure to discuss Sellers' illiteracy was error because Sellers raised the issue at hearing. Although Sellers' literacy may not have been relevant to many of the low-level labor jobs suggested by the VE, it is not clear from the ALJ's questioning whether some of the jobs available to Sellers under the ALJ's hypothetical would require literacy. More importantly, Sellers' claimed illiteracy may be relevant as one of the four factors that would mandate a finding of disability if, after reconsideration of Sellers' credibility regarding his drowsiness (which allegedly precipitated

---

168 *Id.* at 9-10 (citing r. at 40).
169 Dkt. 35 (citing 20 C.F.R., Part 404, Aubpart P, Appendix 2).
170 Sellers is now forty-five years old, r. at 39, and the ALJ determined Sellers was unskilled, r. at 23, 54.
171 Dkt. 31 at 4.
172 *Id.* at 5.
173 *Yourek v. Barnhart*, 334 F.Supp.2d 1090, 1093 (N.D. Ill. 2004) (citing *Tayler v. Apfel*, 2003 WL 21087955, *6 (N.D. Ill. May 13, 2003).
174 *Id.*

his use of a cane), the ALJ were to find Sellers limited to sedentary work.[175] In the event that the ALJ found Sellers limited to sedentary work, a full discussion of his literacy would be necessary.

### 3.    Evidence of Sellers' Psychotic Disorder

Sellers next alleges that the ALJ did not adequately consider his psychotic disorder.[176] Specifically, Sellers argues that the ALJ failed to explain how she incorporated his hallucinations and social difficulties into the RFC.[177] Sellers analogizes his case to that of *Spiva v. Astrue*, where the Seventh Circuit found the claimant, "a psychotic person busy trying to cope with evil spirits and evil thoughts," would no longer be able to cope with customers in large retail stores.[178] Sellers likewise claims that he would be unable to interact with the general public, as required by the VE's proffered jobs.[179] Sellers also contends the ALJ failed to make a finding that his mental illness would not prevent him from performing the representative jobs.[180]

The Commissioner counters that the ALJ properly accorded little weight to Sellers' claim of hallucinations because Sellers had never told his doctors about them.[181] The Commissioner argues that the claimant in *Spiva* was more limited by his mental condition, which caused him to experience thoughts of wanting to hurt people and a previous suicide attempt.[182] The Commissioner observes that, unlike the claimant in *Spiva* , Sellers does "not always have thoughts of wanting to hurt people," and has no documented history of suicidal or homicidal thoughts.[183]  The Commissioner

---

[175] *See Cole v. Apfel*, 2000 WL 290432, *2 (N.D. Ill. Mar. 17, 2000).
[176] Dkt. 29 at 11.
[177] *Id.*
[178] *Spiva*, 628 F.3d at 350.
[179] Dkt. 29 at 11.
[180] *Id.* at 12 (citing *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)).
[181] Dkt. 31 at 6.
[182] *Id.* (citing *Spiva*, 628 F.3d at 349).
[183] *Id.*

further notes that Sellers has held several jobs, despite experiencing hallucinations throughout his adult life.[184] The Commissioner cites Seventh Circuit case law for the proposition that an ALJ may reasonably find that an impairment is not disabling where the claimant has worked despite the impairment in the past, and the claimant's condition has not significantly deteriorated.[185] Finally, the Commissioner notes that the ALJ nonetheless took Sellers' allegations regarding his antisocial tendencies into account in the RFC, which provides for only occasional contact with others.[186]

We agree with the Commissioner that the ALJ fully considered the medical evidence of Sellers' psychotic symptoms, including their duration and nature.[187] Sellers misconstrues *Punzio v. Astrue* in his charge that the ALJ was required to make a special finding that Sellers' mental illness did not prevent him from working.[188] Further, while observing the Commissioner's cogent reference to *Johnson v. Barnhart* for the rule that past work despite an impairment may be considered in ascertaining the severity of an impairment (or lack thereof), we note that the ALJ did not use Sellers' past work as a reason for finding him not disabled by his psychosis, and we will not inject this reasoning into her opinion.[189] The ALJ's discussion of the reports of all mental health experts who opined on Sellers' psychosis was sufficient to support her finding that this impairment would not significantly limit Sellers' ability to perform the proffered jobs.[190]

### 4. Evidence of Sellers' Chronic Kidney Disease

---

[184] *Id.* at 7.

[185] *Id.* (citing *Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006)).

[186] *Id.* at 8.

[187] *See* r. at 24-25.

[188] *Punzio*, 630 F.3d at 710.

[189] *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing the *Chenery* doctrine); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943) (forbidding an agency's lawyers from defending an agency decision on grounds the agency itself did not use).

[190] *See* r. at 476 (Dr. Heinrich noted, "[b] the claimant's description the hallucinations are not intrusive or distressing"); *see* r. at 482 (Dr. Brauer noted, "[Sellers'] mental health history is negative with the exception of his described hallucinations, which, by his description are not intrusive nor distressing").

Sellers argues the ALJ failed to incorporate evidence of his CKD into her RFC, specifically his claimed side-effect of drowsiness.[191] Sellers asserts that the ALJ did not consider his CKD "in the context of [his] other impairments."[192] The Commissioner counters that no evidence supports Sellers' claim that his CKD causes fatigue, observing that Dr. Ahmed, who treated Sellers for renal failure in 2004, reported that Sellers was "asymptomatic."[193]

We find Sellers' argument persuasive based on the Seventh Circuit's ruling that if an ALJ "found that one or more of [a claimant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of this entire constellation of ailments - including those impairments that in isolation are not severe."[194] However, as Sellers' only claimed symptom from his CKD is fatigue, we find any error on this point is overshadowed by the ALJ's lack of discussion regarding the evidence of Sellers' fatigue in her credibility determination and her failure to demonstrate how she incorporated his drowsiness into the RFC.

The Court also finds error in some of the reasoning offered by the ALJ in support of her decision to wholly discount the Physical Impairment Residual Functional Capacity Questionnaire ("Questionnaire"), which was apparently filled out by Dr. Sifuentes, one of Sellers' treating physicians.[195] The Questionnaire indicated that an inguinal hernia, hypertension and CKD would cause Sellers to experience pain or discomfort severe enough to interfere with concentration on a frequent basis."[196] The Questionnaire also stated that Sellers would be able to walk less than one city

---

[191] Dkt. 29 at 12.

[192] *Id.*

[193] Dkt. 31 at 9 (citing r. at 306, 310).

[194] *Golombiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. 404.1523, which states, "[i]n determining whether your...impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

[195] R. at 25. The ALJ noted that the signature on the form appears to be that of Dr. Sifuentes.

[196] R. at 438.

block before tiring, would need to take unscheduled breaks, and should never carry any amount of weight in the workplace.[197] The ALJ accorded no weight to the Questionnaire for several reasons, including her belief that "hypertension which is fairly controlled with medication would not reasonably caused [sic] restrictions of sitting, standing and walking."[198] We note that an ALJ may not make independent medical conclusions unsupported by expert opinion.[199] However, an ALJ may discount a medical opinion based on conflicting contents or conflicts between the opinion and the record as a whole.[200] Since the ALJ also discounted the questionnaire on these bases,[201] we will not disturb the ALJ's finding on this point.

## VI.    Conclusion

We conclude that the errors in the ALJ's credibility assessment are significant enough to require a remand. Remand is not warranted where, despite errors, the outcome would be the same.[202] We cannot, however, say that is the case here. Within the body of medical evidence some reports support Sellers' claim of disability. We cannot say with confidence that the ALJ's assessment of that evidence - the analysis of his mental impairments and the effects of his medication on his functional capacity - would be unaffected by a different assessment of Sellers' credibility.

In remanding, we do not dictate to the ALJ what her evaluation of Sellers' credibility should

---

[197] R. at 440-41.

[198] R. at 25.

[199] *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (finding by ALJ that speech and language difficulties were inconsistent with a diagnosis of mental retardation); *citing Herron*, 19 F.3d at 334 (stating that ALJ may not make independent medical conclusion that air conditioning would improve a claimant's lung disorder); *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996) (holding that ALJs may not make independent medical findings regarding whether certain activities are inconsistent with a particular medical diagnosis).

[200] 20 C.F.R. 404.1527(c).

[201] R. at 25.

[202] *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006).

be, or what decision should ultimately be made respecting his claim of disability. That will be for the ALJ to determine. However, in making her determination, the ALJ must rely on appropriate considerations with reasoning supported by the record, and must explain her rejection of any contrary evidence.[203]

For the reasons set forth above, Sellers' motion for summary judgment [dkt. 28] is granted, and the Commissioner's cross-motion [dkt. 30] is denied. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**The Honorable Susan E. Cox**

**United States Magistrate Judge**

**Dated: January 31, 2012**